USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__2/27/2026__

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DILLARD'S, INC. and DILLARD INVESTMENT CO., INC.,

                Plaintiffs,

- against -

WELLS FARGO BANK, N.A.,

                Defendant.

**25 CV 4330 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

In this action, plaintiffs Dillard's, Inc. and Dillard Investment Co., Inc. (collectively, "Dillard's") allege that defendant Wells Fargo Bank, N.A. ("Wells Fargo" or the "Bank") breached an agreement governing a jointly administered co-branded credit card program. (See "Complaint" or "Compl.," Dkt. No. 1.) Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), Wells Fargo now moves to dismiss the claims at issue in this litigation. (See "Motion" or "MTD," Dkt. No. 30.) For the reasons set forth below, Wells Fargo's motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND[1]

Dillard's, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in

---

[1] Except as otherwise noted, the following background derives from the Complaint, in addition to the supporting declarations and exhibits attached to the parties' briefs. (See Dkt. Nos. 1, 31, 43, 48.) The Court takes all facts alleged therein as true and construes the justifiable

1

Little Rock, Arkansas. (See Compl. ¶ 21.) Dillard Investment Co., Inc. is a corporation organized under the laws of Delaware, with its principal place of business in Las Vegas, Nevada. (See id. ¶ 22.) Dillard's operates a chain of department stores located in thirty states across the United States. (See id. ¶ 28.)

On March 31, 2014, Dillard's and Wells Fargo – a national bank – entered into a contract (the "Agreement") to jointly administer a co-branded and private label credit card through a program (the "Program") that would provide customers with loyalty rewards for shopping at Dillard's, among other benefits. (See id. ¶¶ 3, 7, 23, 31; Agreement, Dkt. No. 1, Ex. 1.) According to Dillard's, when Wells Fargo first made its representations and warranties reflected in the Agreement – including representations that no material "action, claim, litigation, proceeding, arbitration or investigation [wa]s pending or . . . threatened" against the Bank and that no order existed that "restrict[ed] or would reasonably be expected to restrict" the Bank's ability to perform its obligations (Agreement §§ 11.2(d)-(e)) – Wells Fargo was the subject of pending federal, state, and local investigations

_____

inferences arising therefrom in the light most favorable to Dillard's, as required under the standard set forth in Section II below.

relating to improper business practices, including the practice of "secretly opening unauthorized deposit and credit card accounts." (Id. ¶ 40.)

In September 2016, an investigation by the Department of Justice ("DOJ") was publicly revealed when Wells Fargo entered into a consent order (the "2016 Order"), after it was determined that the Bank "submitted applications for credit cards in consumers' names using consumers' information without their knowledge or consent." (Id. ¶ 45; "2016 Order," Dkt. No. 32-2 at 1.) The 2016 Order "did not refer to or necessarily bear on" the Program, and Wells Fargo – after an inquiry by Dillard's – represented that the 2016 Order would not impact the Program. (Compl. ¶¶ 46-48.)

In 2018, Wells Fargo entered into a separate consent order (the "2018 Order," and together with the 2016 Order, the "Consent Orders"), which prohibited the Bank from taking "any action that would cause the average of [its] total consolidated assets . . . to exceed the consolidated assets reported as of December 31, 2017." (Id. ¶ 49; "2018 Order," Dkt. No. 32-3 at 8.) The 2018 Order, "on its face," also "did not refer to or necessarily bear on the Program." (Compl. ¶ 49.)

The DOJ's investigation concluded in 2020, culminating in a Deferred Prosecution Agreement ("DPA"), whereby Wells Fargo agreed to pay $3 billion for, in part, engaging in practices that "led thousands of employees to provide millions of accounts or products to customers under false pretenses or without consent, often by creating false records or misusing customers' identities." (Id.)

Dillard's asserts that Wells Fargo "responded to the Consent Orders by abandoning the Program and exiting the market without informing" Dillard's – breaching the parties' contract by ceasing to invest in the Program or further its success – which caused Dillard's to suffer monetary damages. (Id. ¶¶ 16, 20.)

Dillard's asserts nine causes of action, alleging that Wells Fargo: (1) "breached Section 11.2(d) of the Agreement by making false representations and warranties that no investigation was pending or threatened that would reasonably be expected to have a Bank Material Adverse Effect" (id. ¶ 82); (2) "breached Section 11.5(a) of the Agreement by failing to promptly notify Dillard's of the investigations and Consent Orders that would reasonably be expected to have a Bank Material Adverse Effect" (id. ¶ 87); (3) "breached Section 11.2(e) of the Agreement by making false

4

representations and warranties that it was not subject to an Applicable Order that would reasonably be expected to restrict in any respect Wells Fargo's ability to perform all of its obligations under the Program" (id. ¶ 92); (4) "breached Section 3.1 of the Agreement by, among other things, violating the key Program Objectives of . . . increasing the Program's customer base, retail sales, and profitability and improving the Program's brand and user experience" (id. ¶ 97); (5) "breached Schedule 4.1 by failing to provide for the acceptance of credit applications from a mobile application" (id. ¶ 102); (6) "breached Schedule 17.2(i) of the Agreement by failing to compensate Dillard's for Excluded Accounts in accordance with the Agreement" (id. ¶ 107); (7) "breached Schedule 9.3 of the Agreement by failing to compensate Dillard's for Joint Program Activities in accordance with the Agreement" (id. ¶ 112); (8) "breached Section 2.1(a) and Section 4.6(a) of the Agreement by making credit decisions based on criteria not included in its Risk Management Policies" (id. ¶ 117); and (9) breached the implied covenant of good faith and fair dealing by "diminish[ing] the economic value of the Program" and "engag[ing] in a course of conduct with the purpose and effect of undermining the Program" (id. ¶¶ 122-23, 125).

On July 17, July 24, October 21, and October 22, 2025, the parties exchanged pre-motion letters pursuant to this Court's Individual Practice II.B. On November 6, 2025, Wells Fargo filed its motion to dismiss (see Motion), supported by a memorandum of law. (See "Mem.," Dkt. No. 31.) On December 4, 2025, Dillard's filed an opposition. (See "Opp'n," Dkt. No. 43.) On December 23, 2025, Wells Fargo filed a reply. (See "Reply," Dkt. No. 48.) On December 30, 2025, Dillard's submitted a letter motion for leave to file a sur-reply ("Dillard's Letter"), to which Wells Fargo submitted a letter in response on January 1, 2026 ("Wells Fargo Letter"). (See Dkts. No. 50-51.) On January 6, 2026, the Court issued an order granting the motion for leave and the request to consider the attached sur-reply.[2] (See Dkt. No. 52.)

## II.  **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly,

---

[2] In its letter, Dillard's requested that the Court decline to consider two new arguments that it asserted Wells Fargo raised for the first time in its Reply: (1) that Arkansas law applies under New York's borrowing statute; and (2) that the claims should be dismissed with prejudice. (See Dkt. No. 50 at 1.) After considering both parties' letters, the Court determined that it would consider those arguments but afford Dillard's the opportunity to address them in its sur-reply. (See Dkt. No. 52.)

550 U.S. 544, 570 (2007)). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020) (quoting Twombly, 550 U.S. at 556); see Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

In determining whether a complaint states a claim that is plausible, courts must "give no effect to assertions of law or to legal conclusions couched as factual allegations but [must] accept as true the factual allegations of the complaint and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." Anderson News, L.L.C. v. American Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (citation modified); see Iqbal, 556 U.S. at 678. In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." Doe v. N.Y. University, No. 20-

CV-1343, 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (citation omitted).

### III. <u>DISCUSSION</u>

#### A.    <u>COUNTS ONE, TWO, AND FIVE</u>

Dillard's alleges in Counts One and Two of its Complaint that Wells Fargo breached the Agreement by failing to reveal the pending investigations and by failing to notify Dillard's of the Consent Orders. (<u>See</u> Compl. ¶¶ 82, 87.) Dillard's alleges in Count Five that Wells Fargo breached the Agreement by failing to provide for the acceptance of credit applications from a mobile application. (<u>See</u> <u>id.</u> ¶ 102.) As to those allegations, the Court need not analyze the merits of Dillard's breach of contract claims. Each count is time-barred under the applicable statute of limitations. To argue that Counts One, Two, and Five are not time-barred, Dillard's points the Court to two doctrines: (1) the continuing breach doctrine; and (2) the doctrine of equitable estoppel. (<u>See</u> Opp'n at 15-20.) The Court addresses each argument in turn.

#### 1.    <u>Continuing Breach</u>

Where jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state. <u>See</u> <u>Forest Park Pictures v. Universal Television Network, Inc.</u>, 683 F.3d 424, 433 (2d

Cir. 2012); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Federal courts exercising diversity jurisdiction must follow the substantive law of the state in which they are located, see Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), including statutes of limitations. See Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 710 (2d Cir. 2002) ("A state's rules providing for the start and length of the statute of limitations is substantive law."); Stuart v. American Cyanamid Co., 158 F.3d 622, 626 (2d Cir. 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations.").

New York's borrowing statute, N.Y. C.P.L.R. § 202 ("Section 202"), provides that "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." Stuart, 158 F.3d at 627; see also Glob. Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 528 (N.Y. 1999) ("When a nonresident sues on a cause of action accruing outside New York, [Section] 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where

the cause of action accrued."). New York follows "the traditional definition of accrual - a cause of action accrues at the time and in the place of the injury." Glob. Fin. Corp., 93 N.Y.2d at 529. Where the "injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." Id.

Dillard's argues that Section 202 does not require the application of another state's law, but that even if it does, Delaware law would apply given that Dillard's is incorporated in that state. (See Dillard's Letter at 2.) Wells Fargo contends that the statute requires the application of the laws of Arkansas – home to the headquarters of Dillard's, Inc. – or the laws of Nevada – home to the headquarters of Dillard Investment Co., Inc. (See Reply at 8 n.6.)

Here, the Court is persuaded that Arkansas law applies. Although some courts have found that a company's place of incorporation is determinative, as the Second Circuit has explained, "[i]t would seem that an economic harm has greater effect on a for-profit enterprise's activities at its principal place of business rather than at its place of incorporation." Luv N' Care, Ltd. v. Goldberg Cohen, LLP, 703 F. App'x 26, 28 (2d Cir. 2017); see also Cantor Fitzgerald, 313 F.3d at 710 (finding that where the "injury is purely

economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss" (internal quotations marks and citation omitted)); Pac. Life Ins. Co. v. Bank of New York Mellon, No. 17-CV-1388, 2023 WL 5128079, at *26 (S.D.N.Y. Aug. 10, 2023) (finding the cause of action accrued in the state of plaintiff's principal place of business).

As Wells Fargo contends, its obligations under the Agreement ran to Dillard's, Inc., which is headquartered in Arkansas. (See Agreement at 1 (defining the "Company" as Dillard's, Inc.).) Because Dillard's, Inc. is a Delaware corporation with its principal place of business in Arkansas, Section 202 applies and requires a determination of whether New York or the state where the cause of action accrued has the shorter statute of limitations. New York applies a six-year statute of limitations period for contract actions. See N.Y. C.P.L.R. § 213(2). Arkansas law provides for a five-year period. See Ark. Code § 16-56-111. Thus, Arkansas's statute of limitations controls here, "including all relevant tolling provisions." Adams v. Deutsche Bank AG & Deutsche Bank Sec., Inc., No. 11-CV-1893, 2012 WL 12884365, at *3 (S.D.N.Y. Sept. 24, 2012), aff'd sub nom. Adams v. Deutsche Bank AG, 529 F. App'x 98 (2d Cir. 2013).

First, Dillard's asserts that Counts Two and Five are timely because Wells Fargo had a "continuing duty under Section 11.5(a) to notify Dillard's of material developments affecting the Program," as well as an "ongoing obligation" "to provide for the acceptance of credit applications from a mobile application" pursuant to Schedule 4.1. (Opp'n at 15, 19.) Dillard's argues that under New York law, the continuing breach – or continuing wrong – doctrine applies "where there is a series of continuing wrongs" and "toll[s] the running of a period of limitations to the date of the commission of the last wrongful act." (Id. at 15 (quoting Henry v. Bank of America, 48 N.Y.S.3d 67 (1st Dep't 2017).) Here, Dillard's contends that Wells Fargo's "recurring" "failure to share information" concerning the Consent Orders and its failure to "review and process Applications" "during the [Agreement's] Term and continuing until the end of the Termination Period" constitute continuing wrongs that extend the statute of limitations. (Opp'n at 15-16, 19-20.)

However, as stated above, Arkansas law – not New York law – controls here. See, e.g., Network Apps, LLC v. AT&T Mobility LLC, No. 21-CV-718, 2025 WL 1115284, at *19 n.11 (S.D.N.Y. Apr. 15, 2025) (rejecting plaintiffs' argument that their breach of contract claim would be subject to tolling

under the continuing violation doctrine even if it were otherwise time-barred, explaining that "in light of New York's borrowing statute," that doctrine "arises only under New York law" and not the law of the other applicable state).

While New York courts have applied the continuing breach doctrine to impose such a continuing duty, see Garron v. Bristol House, Inc., 162 A.D.3d 857, 859 (2d Dep't 2018), as Wells Fargo notes, "Arkansas courts have repeatedly rejected continuing-wrong theories." Ark. Valley Elec. Coop. v. Southwestern Bell Tel. Co., 2017 WL 3314008, at *12 (W.D. Ark. Apr. 17, 2017); see also Beckworth v. Diamante, Priv. Membership Golf Club, LLC, 379 S.W.3d 752, 760 (Ark. Ct. App. 2010) (rejecting the continuing breach theory and explaining that the "true test in determining when a cause of action for breach of contract arises or accrues is to establish the time when the plaintiff could have first maintained the action to successful conclusion"). Accordingly, the Court declines to apply the continuing breach doctrine to Counts Two and Five – which are alleged to have accrued more than six years ago (see Compl. ¶¶ 87, 102; Agreement §§ Section 11.5(a), Schedule 4.1) – and finds that they are barred by the five-year statute of limitations applicable in Arkansas.

2.   Equitable Estoppel

Dillard's next argues that even if Counts One and Two are time-barred, Wells Fargo is equitably estopped from asserting the statute of limitations defense. (See Opp'n at 16-18.) When applying another state's statute of limitations pursuant to Section 202, "[a]ll the extensions and tolls applied in the foreign state must be imported with the foreign statutory period, so that the *entire* foreign statute of limitations . . . applie[s], and not merely its period." Smith Barney, Harris Upham & Co. v. Luckie, 85 N.Y.2d 193, 207 (N.Y. 1995) (citation omitted) (emphasis in original); see also Antone v. Gen. Motors Corp., Buick Motor Div., 64 N.Y.2d 20, 31 (N.Y. 1984) ("It is true that in borrowing a Statute of Limitations of another State, a New York court will also borrow the other State's rules as to tolling." (internal quotation marks and citation omitted)); Thea v. Kleinhandler, 807 F.3d 492, 500 (2d Cir. 2015) (citing Luckie and Antone to analyze an equitable estoppel claim under another state's law after applying New York's borrowing statute).

Equitable estoppel is based on the "principle that an unreasonable delay by the party seeking relief precludes recovery when the circumstances are such as to make it inequitable or unjust for the party to seek relief." Royal

14

Oaks Vista, L.L.C. v. Maddox, 372 Ark. 119, 123–24 (Ark. 2008). Under Arkansas law, "[t]he elements of estoppel include: (1) the party to be estopped knew the facts; (2) the party to be estopped intended that the conduct be acted on; (3) the party asserting the estoppel was ignorant of the facts; and (4) the party asserting the estoppel relied on the other's conduct and was injured by that reliance." Felton v. Rebsamen Med. Ctr., Inc., 373 Ark. 472, 481 (Ark. 2008). "The party seeking estoppel has the burden to prove all four elements." In re Garrison, 462 B.R. 666, 683 (Bankr. W.D. Ark. 2011). Dillard's argues that it "exercised due diligence by confronting Wells Fargo" about the impact of the Consent Orders, Wells Fargo "concealed" the true effects of those orders, and Dillard's "reasonably relied" on Wells Fargo's assurances that it was committed to the Program. (Opp'n at 17.)

The Court is unpersuaded that Dillard's has met its burden to prove that equitable estoppel applies. Dillard's argues that the issue was not the Consent Orders' "mere existence" but "their practical effects" and that only "Wells Fargo knew those facts, leaving Dillard's to rely on the Bank's (mis)representations." (Id. at 17-18.) But Dillard's "exercise[d] day-to-day operational oversight of the Program"

15

through the appointment, along with Wells Fargo, of "one full-time employee as Program relationship manager" and was privy to information concerning the Program's performance, customer data, and other operational feedback and standards – including extensive and frequent reports regarding account numbers, credit limits and authorizations, and applications. (Agreement §§ 3.3, 7.1, Schedule 7.1(a).) Dillard's fails to support its assertions that reasonable due diligence would not have uncovered the "practical effects" stemming from the Consent Orders or explicit evidence of Wells Fargo's alleged "subversion of the Program." (Opp'n at 17-18.) Accordingly, the Court finds that equitable estoppel does not apply here, and that Counts One and Two are time-barred, as they are alleged to have accrued outside the applicable five-year statute of limitations period. (See Compl. ¶¶ 82, 87; Agreement §§ Section 11.2(d), Schedule 4.1.)

Because the continuing breach doctrine and the doctrine of equitable estoppel are inapplicable to the facts at hand, the Court grants Wells Fargo's motion to dismiss Counts One, Two, and Five of the Complaint.

B.    COUNT SIX

The Court declines to dismiss Count Six of the Complaint. In Count Six, Dillard's alleges that Wells Fargo "breached

16

Schedule 17.2(i) of the Agreement by failing to compensate Dillard's for Excluded Accounts in accordance with the Agreement." (Compl. ¶ 107.) In summary, Schedule 17.2(i) provides that "upon termination, Wells Fargo was required to either (i) sell all 'Excluded Accounts' . . . over time and share a specified portion of the proceeds with Dillard's . . . or (ii) provide Dillard's 'notice that it does not intend to sell the Excluded Accounts,' in which case Wells Fargo was obligated to immediately pay to Dillard's 61% of Total Expected Recoveries." (Id. ¶ 68; Agreement, Schedule 17.2(i).) As Dillard's alleges, Wells Fargo opted for the immediate payment option but "refused to apply" the "formula by which [the Bank] was required to calculate the Total Expected Recoveries on the Excluded Accounts" pursuant to the Agreement's language. (Compl. ¶ 70.) Therefore, Dillard's contends that Wells Fargo "failed to compensate Dillard's for the value of the entire Cardholder Indebtedness across the entire population of Excluded Accounts" – which, Dillard's asserts, is a breach of the plain language of the Agreement.

Wells Fargo argues that it "paid Dillard's over $5.2 million at termination," and that, "[i]f Dillard's disagreed with that figure," Dillard's should have raised the "issue through the Program Agreement's mandatory dispute resolution

17

process." (Mem. at 27; Agreement § 12.4 ("Any disagreement, controversy, dispute or claim arising out of or relating to this Agreement . . . shall be submitted to the Strategic Operating Committee.").) Wells Fargo contends that "Dillard's did not invoke the mandatory dispute resolution process," and now, "long after accepting Wells Fargo's payment, . . . [Dillard's] claims that Wells Fargo's calculation was short." (Mem. at 27.)

Wells Fargo also argues that, subsequently, the parties *did* submit the disagreement to the modified dispute resolution process, and the committee failed to reach an agreement on the proper lump-sum calculation. (See Mem. at 28.) Wells Fargo then notified Dillard's that Wells Fargo would instead elect the first option provided for by Schedule 17.2(i) and would pay Dillard's based on actual recoveries and not pay a lump sum. (See id.) Given those developments, Wells Fargo contends that Count Six is moot and that the "dispute about the proper calculation of the lump sum is now academic" – requiring dismissal Dillard's claim for lack of subject matter jurisdiction. (Id.)

Dillard's argues that Count Six is not moot, as the alleged events are not contained in and post-date the Complaint, "the Agreement provides no mechanism for re-

18

election," Wells Fargo's election was irrevocable, and the new offer to pay Dillard's additional money is merely "an attempt to mitigate future damages, not a basis for dismissal." (Opp'n at 25-26.)

"A case in federal court must be alive at all stages of judicial proceedings, not only at the point at which a suit was originally filed." Deeper Life Christian Fellowship, Inc. v. Sobol, 948 F.2d 79, 81 (2d Cir. 1991). Here, the Court finds that a justiciable controversy remains alive. The plain language of the Agreement contains no provision pursuant to which Wells Fargo could re-elect and pay based on actual recoveries. Indeed, Dillard's cites persuasive case law finding that "[o]nce an election has been made, the contract ceases to be an alternative contract . . . and the electing party is obligated to perform in accordance with the method of performance elected by him." Zigman v. Rosen, 133 A.D.2d 399, 401 (2nd Dep't 1987); (Opp'n at 25-26).

In its Complaint, Dillard's alleges that Wells Fargo "breached Schedule l7.2(i) of the Agreement by failing to compensate Dillard's for Excluded Accounts in accordance with the Agreement" and that "[a]s a direct and proximate result of Wells Fargo's breaches of contract, Dillard's has suffered monetary damages." (Compl. ¶¶ 107-08.) Wells Fargo contends

19

that it has made payments pursuant to its re-election – and is now ahead on payments (see Reply at 11 n.8) – but it fails to meet its burden to show that those payments have mooted an alleged pre-existing breach. As Dillard's argues, courts have found a "delay of payment, in and of itself" to constitute a "concrete harm." Charles v. U.S. of Aritzia Inc., 2024 WL 4167502, at *2 (S.D.N.Y. Sept. 12, 2024).

Regardless, here, "the parties' submissions present factual disputes that cannot be resolved on a motion to dismiss." Stewart v. Metro. Life Ins. Co., No. 21-CV-8092, 2025 WL 2710112, at *7 (S.D.N.Y. Sept. 22, 2025). In light of the allegations contained within the Complaint – and given that "[a] party seeking to have a case dismissed as moot bears a heavy burden" – the Court finds that Count Six should proceed.

C.    COUNT THREE

With the time-barred and mooted claims dismissed, the Court proceeds to the merits of the remaining claims. Count Three alleges that Wells Fargo "breached Section 11.2(e) of the Agreement by making false representations and warranties that it was not subject to an Applicable Order that would reasonably be expected to restrict in any respect Wells

Fargo's ability to perform all of its obligations under the Program." (Compl. ¶ 92).

"A complaint for breach of contract under New York law need allege only: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." Kalimantano GmbH v. Motion in Time, Inc., 939 F. Supp. 2d 392, 414 (S.D.N.Y. 2013) (internal quotation marks and citation omitted). "In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into the agreement." Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990). Where a contract is "unambiguous on its face, its proper construction is a question of law." Id. at 889; see also PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) ("[W]here the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may thus be determined . . . by [a motion to dismiss]." (internal quotations marks and citation omitted)).

Here, Wells Fargo argues that the Complaint lacks factual support – noting that the "Consent Orders never mentioned cobranded cards or the Dillard's program." (Mem. at

15.) Wells Fargo contends that "Dillard's alleges nothing to make it plausible that, despite the apparent lack of relevance, the Consent Orders were reasonably 'expected' to harm . . . Wells Fargo's ability to perform" its Program obligations. (Id.) Separately, Wells Fargo argues that Dillard's fails to link the alleged nondisclosure of the Consent Orders to damages or show how any harm Dillard's claims it suffered is attributable to Wells Fargo's alleged breach of Section 11.2(e). (See id. at 16.)

At the outset, the Court finds that because Dillard's "is not obligated to show, on a motion to dismiss, that it actually sustained damages" and "need only plead allegations from which damages attributable to [Wells Fargo's breach] might be reasonably inferred," Dillard's has plausibly pleaded damages sufficient to support Count Three. Kapsis v. American Home Mortg. Servicing Inc., 923 F. Supp. 2d 430, 450 (E.D.N.Y. 2013) (internal quotation marks and citation omitted); see also Bocci v. Nationstar Mortg. LLC, No. 23-CV-1780, 2024 WL 4326932, at *16 (S.D.N.Y. Sept. 27, 2024) ("At the motion to dismiss stage, damages need only be plausible, not certain or even likely.").

Dillard's alleges that "Wells Fargo's refusal to extend credit and increase credit limits" – which it contends was

22

driven in part by "significant regulatory and practical constraints that the Consent Orders imposed" – "caused significantly less overall usage of the Dillard's Card, and thus substantially decreased the value of the card portfolio and the revenues Dillard's received under the Agreement." (Compl. ¶ 56.) Dillard's further alleges that "[b]etween December 2014 and September 2024, total Program receivables . . . dropped by over $630 million" – a decrease Dillard's asserts, again, was tied to Well Fargo's restricted ability to perform under the Program. (Id. ¶¶ 63-65, 92.) Thus, the Court finds that the allegations of damages stated in the Complaint are sufficient to withstand a motion to dismiss.

Likewise, accepting the factual allegations claimed in the Complaint, construing the pleadings in the light most favorable to Dillard's, and resolving doubts and drawing reasonable inferences in Dillard's favor, the Court finds that Dillard's pleads enough facts to state a claim that Wells Fargo breached Section 11.2(e) of the Agreement. Moreover, applying this standard, Dillard's plausibly alleges that the Consent Orders "restrict[ed] or would be reasonably expected to restrict in any respect [Wells Fargo's] ability to perform all of its obligations under the Program." (Agreement § 11.2(e).) As alleged in the Complaint, the 2018 Consent Order

"stated that Wells Fargo 'shall not . . . take any action that would cause the average of [Wells Fargo's] total consolidated assets . . . to exceed the consolidated assets reported as of December 31, 2017.'" (Compl. ¶ 49; 2018 Order at 8.)

According to Dillard's, "the significant regulatory and practical constraints that the Consent Orders imposed" on Wells Fargo drove the Bank to "refus[e] to extend credit and increase credit limits" – which restricted its ability to perform all of its obligations pursuant to the Agreement. (Compl. ¶¶ 56-57.) Here, the Court agrees with Dillard's that constraints imposed by the Consent Orders – including the asset cap - could reasonably be expected to impact Wells Fargo's obligations and ability to perform, even if the orders, as Dillard's concedes, did not on their face "refer to or necessarily bear on the Program." (Id. ¶ 49.) Accordingly, the Court finds that Dillard's pleads enough facts to push its assertions from "conceivable to plausible." Bell Atl. Corp., 550 U.S. at 570; see also Anderson News, L.L.C. v. America Media, Inc., 680 F.3d 162, 189 (2d Cir. 2012) ("The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory;

the question is whether there are sufficient factual allegations to make the complaint's claim plausible.").

D.    COUNTS FOUR AND NINE

In Count Four, Dillard's alleges that Wells Fargo breached Section 3.1 of the Agreement by violating key "Program Objectives." (Compl. ¶ 97.) Specifically, Dillard's asserts that Wells Fargo undermined the Program by failing to "increas[e] the Program's customer base, retail sales, and profitability and improv[e] the Program's brand and user experience." (Id.) Dillard's grounds the stated breaches in Wells Fargo's alleged "failure to offer appropriate mobile technology" and Wells Fargo's "basing [of] credit decisions on improper criteria." (Id. ¶¶ 38, 97; Opp'n at 22.) This ultimate "campaign of subversion," Dillard's contends, also breached the implied covenant of good faith and fair dealing, which Dillard's asserts as Count Nine in its Complaint. (Compl. ¶¶ 122-23, 125; Opp'n at 22.)

At the outset, the Court dismisses the good faith and fair dealing claim. Dillard's argues that "[n]othing in Count 9 limits its ambit to specific acts pertinent to other counts," but aside from the factual assertions concerning Wells Fargo's breaches related to mobile technology and credit criteria, Dillard's offers no other support beyond

25

conclusory statements. And under New York law, "allegations of the breach of the implied covenant are irrelevant to recovery unless they are based on conduct different from the conduct that constitutes the alleged breach of contract." Pearce v. Manhattan Ensemble Theater, Inc., 528 F. Supp. 2d 175, 180 (S.D.N.Y. 2007). Because "all contracts contain an implied covenant of good faith and fair dealing in the course of contract performance," id., a breach of the implied covenant is "merely a breach of the underlying contract." Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013) (quoting Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002)).

Accordingly, "where a plaintiff sues in New York for both breach of contract and breach of the implied covenant of good faith and fair dealing, and bases those two claims on the same facts, the latter claim is 'redundant' and should be dismissed." Liberty Harbor Coffee Inc. v. Moss, No. 25-CV-01335, 2025 WL 2930290, at *12 (S.D.N.Y. Oct. 15, 2025) (quoting Cruz, 720 F.3d at 125). The Court, therefore, dismisses Count Nine on the basis that it duplicates other counts alleged in the Complaint as arising out of the same facts.

As to Count Four, Dillard's supports its allegations that Wells Fargo breached Section 3.1 of the Agreement by offering two factual assertions:[3] (1) Wells Fargo failed "to support applications via a Mobile App," which undercut its obligations to "optimize its multi-channel strategy," "improve digital and mobile technology capabilities associated with the Program," "maintain and improve customer insight and analysis," and "enhance the Company's customer experience" (Compl. ¶ 60); and (2) Wells Fargo refused to extend credit and increase credit limits, which impacted its contractual obligations to "drive the Company's retail sales," "preserve and grow the Company's brand and deepen relationships with Shoppers and Cardholders," "retain and grow Accounts and receivables," "increase Company Credit Card usage," and "ensure that the Company's customers are offered credit" (id. ¶ 57).

As a starting point, the Court notes that Section 3.1 specifies that "each Party shall be *guided by* the following Program objectives . . . which shall in no event override or limit any of the express rights or obligations" contained in

---

[3] As Wells Fargo notes, Dillard's also points to "other failures" that "harmed the Program's and the Company's reputation," but Dillard's offers no other non-conclusory support for its Section 3.1 claim. (Compl. ¶ 17; Mem. at 23.)

the Agreement. (Agreement § 3.1 (emphasis added).) Given the substance of this provision, the Court agrees with Wells Fargo that Section 3.1 "does not mandate outcomes," and it is unclear whether allegations that the Bank "sabotag[ed] the Program rather than growing it as required" could amount to a breach under such ambiguous language. (Compl. ¶ 97; Opp'n at 22.)

However, the Court need not decide that issue, as it is persuaded by Wells Fargo's argument that Count Four is barred because the Agreement contains specific provisions governing credit decisions and the Bank's obligations concerning mobile apps found in Sections 2.1(a), 4.6(a), and 4.8. (See Mem. at 23-24; Reply at 7.) Courts routinely find that "specific terms in a contract will override the general." In re Genesis Glob. Holdco, LLC, 658 B.R. 31, 45 (Bankr. S.D.N.Y. 2024); see also Bowmer v. Bowmer, 50 N.Y.2d 288, 294 (1980); John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co., 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary."); Restatement (Second) of Contracts § 203 (2023) ("In the interpretation of a promise or agreement or

28

a term thereof . . . specific terms and exact terms are given greater weight than general language.").

Here, Dillard's argues that "Section 3.1 requires different performance from Wells Fargo than Sections 2.1(a), 4.6(a), and 4.8," and that "Wells Fargo breached [the] broader-sweeping Program Objectives by sabotaging the Program rather than growing it as required." (Opp'n at 22.) But as noted, aside from the statements concerning credit decisions and mobile applications, Dillard's offers no other non-conclusory factual allegations. Bare assertions and contentions that Wells Fargo breached the Agreement through its "campaign of subversion" do not suffice. (Id.)

Additionally, even if – as Dillard's argues - specific language controls only in circumstances where it conflicts with general contract language, Trans Pacific Leasing Corp. v. Aero Micronesia, Inc., 26 F. Supp. 2d 698, 709 (S.D.N.Y. 1998), the Court finds that such conflict exists here. Even if Wells Fargo was required to provide for the acceptance of credit applications via a mobile application pursuant to Schedule 4.1 of the Agreement – an assertion Dillard's mounts to support time-barred Count Five - Section 4.8 stipulates that Wells Fargo "shall develop a mobile application" "[u]pon mutual agreement of the Parties." (Agreement § 4.8(f).)

Accordingly, the Court is persuaded by Wells Fargo's argument that "if Section 3.1 required Wells Fargo to develop an app absent the parties' agreement, that *would be* a direct conflict with Section 4.8." (Reply at 7.) In this instance, at least, the "specific language" would control over the general terms found in Section 3.1. Separately, as Wells Fargo also notes, Sections 2.1 and 4.6 require Wells Fargo to make credit decisions based on its Risk Management Policies, with Section 4.6 specifically providing that such decisions be "based *solely* upon application of the credit criteria contained in the then current Risk Management Policies." (Id.; Agreement §§ 2.1(a), 4.6(a) (emphasis added).) The Court finds that this provision controls over any "Program Objectives" by which the parties were to be "guided" pursuant to Section 3.1. (Agreement § 3.1.) Accordingly, based upon the facts alleged, Dillard's fails to sufficiently plead that Wells Fargo breached Section 3.1 of the Agreement, and the Court therefore dismisses Count Four.

E.    COUNT SEVEN

In Count Seven, Dillard's alleges that Wells Fargo "breached Schedule 9.3 of the Agreement by failing to compensate Dillard's for Joint Program Activities in accordance with the Agreement." (Compl. ¶ 112.) Schedule 9.3

30

provides that Wells Fargo and Dillard's must each make a "Joint Program Commitment" for each "Fiscal Month during the Term (and continuing through the Termination Period) to support" certain Program activities. (Id. ¶ 75; Agreement, Schedule 9.3(a).) Dillard's alleges that "upon termination, Wells Fargo refused to fund its respective portion of the costs relating to the Program's marketing and rewards features," "leaving Dillard's to bear the burden of funding those activities." (Compl. ¶ 78.)

 Despite Wells Fargo's argument that those allegations are wholly conclusory, applying the standard stated above favoring plaintiffs on a motion to dismiss, the Court is persuaded that – at this stage of the litigation – Dillard's has pleaded enough facts to state a claim. As Dillard's alleges, Schedule 9.3 required each party to pay a certain amount of the joint program activity costs through the termination period. (Id.) Wells Fargo's alleged breach of its obligations purportedly forced Dillard's to cover the costs, which resulted in the claimed monetary damages. (Id. ¶¶ 78, 112.) Such allegations are sufficient to nudge the breach of contract claim "across the line from conceivable to plausible." In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting Twombly, 550 U.S. at

570). Whether Wells Fargo met its obligations pursuant to Schedule 9.3 is a question presenting factual disputes that are not suited for resolution at the motion to dismiss stage. See GeBBS Healthcare Sols., Inc. v. Orion Healthcorp, Inc., No. 16-CV-2206, 2017 WL 1251143, at *4 (S.D.N.Y. Apr. 4, 2017) (finding that "a motion to dismiss is not the proper vehicle for [the moving party] to tell its side of [the] story"). Accordingly, the Court denies Wells Fargo's motion to dismiss Count Seven.

F.    COUNT EIGHT

In Count Eight, Dillard's contends that Wells Fargo "breached Section 2.1(a) and Section 4.6(a) of the Agreement by making credit decisions based on criteria not included in its Risk Management Policies." (Compl. ¶ 117.) Dillard's argues that Wells Fargo's actions were motivated not by the outlined policies found in the contract but by the Consent Orders and the asset cap they imposed. (See id. ¶ 58; Opp'n at 21.) The Complaint contains several factual allegations supporting the pleadings, including that Wells Fargo: (1) "stopped proactively increasing cardholders' lines of credit"; (2) "refused to raise credit limits for cardholders who affirmatively sought an increase and should have been granted one"; (3) lowered application approval rates; and (4)

32

"increased the minimum required FICO score for [applicants] from 560 to 580." (Compl. ¶¶ 54-55; Opp'n at 21.)

Here again, Wells Fargo contends that those allegations are conclusory. It argues that the examples merely reflect "departures from rather than changes to the Risk Management Policies." (Opp'n at 6.) While Wells Fargo might ultimately be correct in that analysis, as may be the case with Count Seven, at this stage of the litigation, and given the applicable pleading standards stated earlier that govern motions to dismiss, as well as the several supporting allegations noted above, the Court finds that Dillard's has set forth enough facts to prevail on a motion to dismiss. Therefore, the Court denies Wells Fargo's motion as to Count Eight.

## IV.  <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 30) filed by defendant Wells Fargo Bank, N.A. ("Wells Fargo") to dismiss the Complaint (Dkt. No. 1) of plaintiffs Dillard's, Inc. and Dillard Investment Co., Inc. (collectively, "Dillard's") is **GRANTED** in part and **DENIED** in part.

It is **ORDERED** that Count One, Count Two, and Count Five are time-barred and dismissed with prejudice; and it is further

**ORDERED** that Count Four and Count Nine are dismissed without prejudice, with leave to replead within fourteen (14) days of the date of this Decision and Order; and it is further

**ORDERED** that Wells Fargo's motion to dismiss Count Three, Count Six, Count Seven, and Count Eight is denied.

The Clerk of Court is respectfully directed to close the motion to dismiss at Docket Number 30. The Clerk of Court is also respectfully directed to close the letter motion to stay discovery pending resolution of the instant motion at Docket Number 55.

**SO ORDERED.**

Dated:     27 February 2026
           New York, New York

Victor Marrero
U.S.D.J.